Daniel L. Steele (Utah State Bar # 6336)
R. Reed Pruyn (Utah State Bar #9985)
215 South State Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 961-1300
Facsimile: (801) 961-1311

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH: CENTRAL DIVISION

---

| | |
|---|---|
| KERRI L. MOLLER, an individual, | COMPLAINT |
| Plaintiff, | |
| vs. | |
| A-PLUS BENEFITS, INC., a Utah Corporation, & EVEREST ADMINISTRATORS, INC., a Utah Corporation, | Case No.  2:13-cv-00903-DBP |
| Defendants. | |

---

Through undersigned counsel, Plaintiff Kerri L. Moller ("***Ms. Moller***") complains and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Ms. Moller is a resident of Utah.

2.      A-Plus Benefits, Inc. ("***A-Plus***" or the "***Plan***") is incorporated in and has its principal place of business in Utah.

1

3.    At times relevant in this action Ms. Moller was enrolled in the Plan and thereby possessed health insurance coverage and benefits through A-Plus.

4.    Everest Administrators Inc. ("*Everest*") is incorporated in and has its principal place of business in Utah.

5.    As alleged herein below more specifically, Everest provides more than ministerial administrative services to the Plan in connection with processing claims for benefits, gathering information for, participating in evaluating and processing of internal appeals of denied claims for benefits, and articulating to claimants purported factual and legal bases for appeal determinations.

6.    The Plan is an employee welfare benefits plan that Defendants operate under the Employee Retirement Income Security Act of 1974 ("*ERISA*"), which Act is codified at 29 U.S.C. §§1001 et seq.

7.    Defendants denied coverage for and then the claims appeals for certain coverage submitted by Ms. Moller, and they thus refused to pay certain health benefits for pre- and post-partum medical care of Ms. Moller provided between about January 6, 2011 and about February 22, 2011.

8.    This Court has original jurisdiction over this ERISA action pursuant to 29 U.S.C. § 1332(e).

9.    Venue is proper because the parties are domiciled in and the acts complained of occurred in this District.

///

///

2

## GENERAL ALLEGATIONS

10. During all times relevant to this action, Ms. Moller was employed by a Kindergarten through Grade 9 charter school in South Jordan, Utah named Early Light Academy.

11. In 2009, Ms. Moller, in her capacity as an Early Light Academy employee, enrolled in and thus became a primary participant of the employer-sponsored health Plan, A-Plus.

12. On January 9, 2011, while a primary Plan participant, Ms. Moller required an emergency Caesarian-section delivery, and she gave birth to a son, A.M, later on that date; they were discharged from the hospital on January 11, 2011.

13. Ms. Moller had paid all Plan premiums for the time periods within which the delivery of A.M. and the associated pre- and post-partum care of Ms. Moller at issue in this action occurred, but for which Defendants nevertheless denied coverage.

14. In mid to late January after Ms. Moller and her newborn son were discharged from the hospital, Ms. Moller informed A-Plus by telephone that she wanted to drop Plan coverage to join a group health plan provided to students and dependents of students of Brigham Young University (the "**BYU Plan**") since Ms. Moller's spouse Brandon was a BYU student.

15. Ms. Moller became eligible for coverage by the BYU Plan as a dependent of Brandon because of the Moller's change in family status, *viz.*, the birth of A.M.

16. During a phone call in mid to late January, 2011, A-Plus informed Ms. Moller of a "Benefits Change Form" she could complete online within its website which would allow her to effectuate a change in coverage.

3

17.     During a phone call on January 24, 2011, Ms. Moller asked A-Plus if her Plan coverage

would remain in effect through the time period for which she had already paid premiums,

and A-Plus told Ms. Moller that it would.

18.     Thus, before Ms. Moller took any step toward dropping Plan coverage to become covered

by the BYU Plan, Ms. Moller gained assurance from A-Plus that her Plan coverage

would remain in effect through at least the time period for which she had already paid

premiums.

19.     On January 27, 2011, Ms. Moller elected to end or drop her Plan coverage and join the

BYU Plan.

20.     Accordingly, on January 27, 2011, Ms. Moller completed the online Benefits Change

Form (the "***Form***") created by A-Plus and/or Everest, printed the completed Form, signed

the completed Form, scanned the completed Form along with a 'certificate of creditable

coverage' letter she had received from the administrator of the BYU Plan that was also

dated January 27, 2011, and emailed the completed Form and aforesaid letter to

Defendants—notifying them of her intent to drop her Plan coverage effective that

submission date.

21.     Ms. Moller intended and understood that coverage under the BYU Plan would begin

January 27, 2011—the date she signed and submitted Defendants' Form to Defendants.

22.     However, on or about February 2, 2011, Defendants terminated Ms. Moller's Plan

coverage ***effective retroactively*** to January 4, 2011.

23.     Ms. Moller never intended nor, given the written terms and provisions of the Plan, could

she or any reasonable person ever have suspected that Defendants would retroactively

4

terminate her Plan coverage to January 4, 2011 or to any date that predated her post-delivery hospital discharge.

24. Instead of coordinating benefits for Ms. Moller as required by the terms and provisions of the Plan—from January 4, 2011 until and through the time period for which Ms. Moller had already paid February Plan premiums—Defendants unilaterally decided to and did refund to Ms. Moller—by direct deposit—$1080.40 in premiums on February 15, 2011.

25. There was no change in the Moller's family status until after Ms. Moller gave birth to A.M., on January 9, 2011.

### Key Provisions of The Plan

26. According to Part X.B. of the "A-Plus Benefits Employee Medical Plan Effective [as of] June 1, 2010 [:] Master Description of the Plan" (the "*Plan Document*") in effect during the times relevant to this action, which section is entitled in part "ERISA Rights [,]" Defendants are express fiduciaries of the Plan and Plan participants owing a duty to operate the Plan prudently ***and*** in the interest of Plan participants.  See Exhibit A hereto, which is a true and correct copy of the Plan Document (emphasis added).

27. Part III.F. of the Plan Document is entitled "Enrollment and Coverage[:] Dropping Coverage" and provides in relevant part only that an employee participant can drop coverage when he/she becomes covered or becomes eligible to be covered under another group health plan.  See Ex. A hereto.

28. Neither Part III.F of the Plan nor any other term or provision of the Plan provides that the Plan's fiduciaries can—even because of a qualifying event—retroactively terminate a Plan participant's coverage for periods of time when premiums have been paid, or

otherwise unilaterally determine a coverage termination date of "y" for an employee participant who elects to end coverage and intends it to end as of "x."

29.    Part III.G. of the Plan Document is entitled "Enrollment and Coverage[:] When Coverage Ends" provides in pertinent part and only that "[c]overage for a participating employee ends on the last day of the month during which the employee no longer meets the eligibility requirements of the Plan. … Coverage for any Participant ends on the first day of any period for which the required contribution [premium] is not paid." <u>See</u> Ex. A.

30.    Ms. Moller met all eligibility requirements of the Plan and remained eligible for Plan coverage each and every day of January 2011 and February 2011 because of her employment status with Early Light Academy.

31.    From January 1, 2011 through February 15 or 28, 2011, Ms. Moller had paid required Plan premiums/made contributions out of her employment income.

32.    Neither Part III.G of the Plan nor any other term or provision of the Plan permits the Plan's fiduciaries to end Ms. Moller's Plan coverage when it did.

33.    Part VII. of the Plan Document, entitled "Other Important Provisions[:] Coordination of Benefits" contemplates that participants, such as Ms. Moller, could have more than one health insurance policy or plan provide coverage to them and expressly addresses how multiple plans and benefits are coordinated.  The Plan states in pertinent part as follows:

"The Plan will coordinate benefits with all other group health plans [and] policies of insurance…under which the Participant is entitled to a payment for medical services, unless prevented from doing so by Federal law. When the Plan is the primary (first) payor, the Plan will pay its normal benefits.
…
The plan which covers an individual as an employee … will be considered primary over a plan that covers the same individual as a dependent."

<u>See</u> Ex. A.

34.    Defendants were required to but did not coordinate Ms. Moller's Plan benefits with her

benefits under the BYU Plan—with the Plan being primary and the BYU Plan being

secondary—between as early as January 4 2011 through at least February 15, 2011.

35.    No term or provision of the Plan permits the Plan's fiduciaries from declining to

coordinate Ms. Moller's Plan benefits (as primary) with her BYU Plan benefits (as

secondary) from as early as January 4, 2011 through at least February 15, 2011.

36.    Defendants' retroactive termination of Ms. Moller's Plan coverage is not provided for in

or by any express or implied term or provision of the Plan.

37.    Defendants' associated decisions in violation of the Plan—the first made on or about

February 2, 2011 and the second made on February 15, 2011—to retroactively terminate

Ms. Moller's coverage on a date before her delivery and in apparent justification thereof

to next refund Ms. Moller's already paid premiums by direct deposit for January and

February 2011, were not in the interest of Ms. Moller or any other Plan participant.

38.    Defendants' associated decisions in violation of the Plan—the first made on or about

February 2, 2011 and the second made on February 15, 2011—to retroactively terminate

Ms. Moller's coverage on a date before her delivery and in apparent justification thereof

to next refund Ms. Moller's already paid premiums by direct deposit for January and

February 2011, were made in purported prudent operation of the Plan only insofar as it

cut or saved costs and pushed responsibility for them onto Ms. Moller because she opted

out of the Plan.

39.   Particularly under the circumstances alleged, Defendants' retroactive termination of Ms.
      Moller's Plan coverage is not in accordance with any accepted standard or procedure in
      the group health plan industry where those who operate a plan owe fiduciary duties to
      participants and intended beneficiaries of a group plan.

40.   On about February 9, 2011, Ms. Moller telephoned Everest.

41.   On the February 9, 2011 telephone call, Ms. Moller conveyed that, if A-Plus wasn't
      going to coordinate benefits but rather was going to stick to an unwritten unpublished
      policy terminating her Plan coverage on the date the BYU Plan coverage could start or
      did start, then the BYU Plan agreed to begin her coverage on February 1, 2011; but
      Everest and A-Plus declined to reconsider their decision to retroactively terminate her
      Plan coverage on a date before her delivery and discharge from the hospital.

42.   Defendants denied all claims seeking coverage and payment of necessary pre-partum care
      on January 6, 2011, labor and delivery on January 9, 2011, post-partum hospital care
      between January 9 and January 11, 2011 and follow-up outpatient care on February 22,
      2011.

43.   Defendants denied coverage for approximately $13,339.76 in claims and refused to pay
      its share of Plaintiff's associated Plan benefits.

44.   Ms. Moller commenced Defendants' internal administrative appeals process on about
      June 1, 2011.

45.   In the course of the internal administrative appeals process, Defendants attempted to
      explain their retroactive termination of Ms. Moller's coverage to a date before her
      delivery (and their attendant decision to refund Ms. Moller's already paid premiums

8

without her request) by claiming solely and repeatedly that a participant's coverage end

date under the Plan is "in all cases" the date of the qualifying event, *viz.*, the date a

participant becomes covered or becomes eligible for coverage under another group plan.

46.     Defendants have never referred Ms. Moller or any other person or governing body to any

term or provision of the Plan which they were purportedly interpreting as support for that

determination or to arrive at that explanation.

47.     There is no term or provision of the Plan that can be interpreted that supports a

determination that a participant who elects to drop coverage because he or she becomes

covered by or becomes eligible for coverage under another group plan will automatically

always lose coverage under the Plan as of that eligibility, or alternatively, that new

coverage date.

48.     In about June 2011, Ms. Moller lodged an administrative agency complaint against the

Defendants with the Utah State Department of Insurance.

49.     When Defendants responded to that agency complaint, in October 2011, they provided to

the Utah Insurance Department a document they referred to an "Event Note"

memorializing an August 25, 2011 phone call from Everest to the BYU Plan or the BYU

Plan administrator.

50.     The copy of the August 25, 2011 Event Note that Defendants provided to the Utah

Insurance Department evidences an express acknowledgment by Everest that because

Ms. Moller signed the Benefits Change Form on January 27, 2011 it was foreseeable that

she would be "…confused…" why her Plan benefits would terminate on January 4, 2011,

*viz.*, retroactive to a date before her delivery and to the date the BYU Plan coverage started.

51.     When in December 2012 Defendants produced its file for Ms. Moller to counsel for the Plaintiffs, the copy of the same August 25, 2011 Event Note kept with other Event Notes in the apparent usual course of business was truncated and in such a way that it did not include Everest's admission foreseeing how Ms. Moller would be confused why her Plan benefits would terminate retroactively.

52.     Plaintiff has met all conditions precedent to bringing this action and she has in particular has exhausted all administrative remedies that must be exhausted before filing this action.

### FIRST CAUSE OF ACTION
**[Recovery of Plan Benefits: 29 U.S.C. § 1132(a)(1)(B)]**

53.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through  52 as if fully set forth herein.

54.     ERISA imposes higher-than-marketplace standards on Defendants and other ERISA fiduciaries and sets forth a special standard of care upon plan fiduciaries, namely that the administrators discharge all plan duties solely in the interest of the participants and the beneficiaries of the plan and for the purpose of providing them benefits.  29 U.S.C. §1104(a)(1).

55.     ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1104(a)(1)(D) and §1133(2).

56.     Defendants' actions, or failures to act in ways they were required to act, constitute

        breaches of their fiduciary duties to the Plaintiffs under 29 U.S.C. §1104 and §1133 and

        include but are not limited to failing to provide benefits as required under the terms of the

        Plan and failing to provide a "full and fair review" of the denial of Ms. Moller's claims

        under the terms of the Plan.

57.     Defendants failed to bear their burden of proving that the Plan supports denial of the

        claims.

58.     Defendants' denial of the Plaintiff's claims and failure to provide her benefits for

        medically necessary care violate the terms and provisions of the Plan and thereby ERISA.

59.     Plaintiff has sustained damages by virtue of Defendants' failure to pay her Plan benefits

        for her medically necessary care, damages that total no less than approximately $10,800,

        and for having caused her and her family to be the target of collections proceedings and

        suffering adverse credit reporting.

60.     Defendants are responsible to pay for Ms. Moller's medical care at issue in this action

        under the terms and provisions of the Plan and as required under ERISA, along with  pre-

        and post-judgment interest to the date of the payment of the unpaid benefits and

        attorneys' fees and costs pursuant to 29 U.S.C. §1132 (g).

<u>SECOND CAUSE OF ACTION</u>
**[Breach of Fiduciary Duties: 29 U.S.C. § 1132(a)(2)]**

61.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 52 as if fully set

        forth herein.

62.     Defendants owe fiduciary duties to Plan participants and beneficiaries, including the discharge of all Plan duties solely in the interest of the participants and the beneficiaries of the Plan and for the purpose of providing benefits to them.  29 U.S.C. §1104(a)(1).

63.     As fiduciaries, Defendants further owed a high degree of care and loyalty to ensure that instructions and all other material relating to terminating Plan coverage were complete and clear not incomplete and confusing and to pay or at least coordinate Plan benefits with the other group plans.

64.     Defendants have breached their fiduciary duties by failing herein to discharge any Plan duty in the interest of any participant including Ms. Moller, by providing a confusing and incomplete Benefits Change Form, retroactively terminating Ms. Moller's Plan coverage to a date before her delivery and during which she had already paid into the Plan, failing to coordinate benefits with the BYU Plan, and providing a confusing and incomplete Plan Document that among other things provided no term or provision or other conceivable support the claims denial determinations and the explanations for them and refusing to pay the claims.

65.     Defendants have damaged the Plaintiff in the form of terminating her Plan coverage on January 4, 2011, failing to coordinate benefits with the BYU Plan, justifying a failure to pay and then failing to pay no less than approximately $10,800 in Plan benefits for her medically necessary care and for causing her and her family to be the target of collections proceedings and suffering adverse credit reporting.

66.     Defendants were responsible to pay for Ms. Moller's medical care at issue in this action under the terms and provisions of the Plan and as required under ERISA, and they are

12

responsible to pay for that care, pre-and post-judgment interest to the date it pays the

benefits and attorneys' fees and costs pursuant to 29 U.S.C. §1132 (g).

**THIRD CAUSE OF ACTION**
**[Equitable Relief: 29 U.S.C. § 1132(a)(3)(B)]**

67.   If the Court determines that Plaintiff cannot recover herein fully and adequately at law,

she pleads this Third Cause of Action in the alternative to the First and Second Causes of

Action above and re-alleges and incorporates by reference the facts in Paragraphs 1

through 52 as if fully set forth herein.

68.   Defendants provided Ms. Moller with a confusing, incomplete and Benefits Change Form

and a confusing and incomplete Plan Document with respect to how and when a Plan

participant's coverage will end.

69.   Ms. Moller would not have taken any step to terminate her Plan coverage in January 2011

had she known Defendants would not act in her interest as Plan fiduciaries and had she

known Defendants would retroactively terminate her Plan coverage to a date before her

delivery and then deny all coverage for periods of time for which she had already paid

Plan premiums.

70.   Plaintiff is entitled to appropriate equitable relief such that the Defendants reinstate her

Plan coverage if necessary but in any event pay what would have been her Plan benefits

for the medically necessary care at issue on this action, reimburse Plaintiff her costs and

expenses associated with collections proceedings and pay her attorneys' fees and costs.

13

71.     Plaintiff is entitled to further equitable relief such that Defendants take all steps necessary

with medical providers and credit reporting agencies to repair and restore her and her

family credit had her benefits been timely paid by Defendants.


WHEREFORE, Plaintiff respectfully requests the following relief:

A.     Entry of a Judgment for payment of denied benefits in the amount of no less than

$10,800 according to proof, plus pre-judgment interest and post-judgment interest

through the date the benefits are paid;

B.     Attorneys fees and costs pursuant to 29 U.S.C. § 1132(g);

C.     For such further or other relief the Court deems just, including equitable relief as

prayed for above if the Court finds that Plaintiff cannot fully and adequately recover by

an award of damages at law.


DATED:      October 4, 2013            ___/s/ Daniel L. Steele_____

                                       DANIEL L. STEELE and
                                       R. REED PRUYN of
                                       STUCKI, STEELE & RENCHER, L.L.C.